```
UNITED STATES DISTRICT COURT___
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
JOHNNY SANTANA,
                                   :
            Petitioner,
                                   :  REPORT & RECOMMENDATION
         - against-
                                   :  06 Civ. 7774 (BSJ)(MHD)

DALE ARTUS, Acting Superintendent, :
Clinton Correctional Facility,
                                   :
            Respondent.
-----------------------------------x
```

TO THE HONORABLE BARBARA S. JONES, U.S.D.J.:


Petitioner Johnny Santana seeks a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his March 24, 2003 conviction in New York State Supreme Court, Bronx County. The court sentenced Santana to an aggregate of approximately twenty-three to forty years in prison after a jury found him guilty of four counts of criminal contempt in the first degree, one count of aggravated criminal contempt, two counts of endangering the welfare of a child, one count of stalking in the first degree, two counts of assault in the first degree, two counts of assault in the second degree, and one count of reckless endangerment in the first degree.


Santana asserts four grounds for relief. First, he claims that his trial counsel denied him effective representation by virtue of his failure to object to "the trial court coercing the jury into a

verdict" and to the trial court's failure either to accept a partial verdict or to declare a mistrial. Second, he asserts that these actions (or inactions) by the trial court denied him due process and a fair trial. Third, he contends that he was denied his rights to present a defense, to due process, to a fair trial by jury, and to confront witnesses, based on (1) the trial court's refusal to charge a justification defense, (2) its improper additional instruction to the jury on a reckless-assault charge, and (3) its incorrect instruction to the jury regarding the relevance of the New York City Patrol Guide to the charges. Finally, he argues that the trial court improperly held that his cross-examination of some of the prosecution's witnesses opened the door to testimony about a prior firearm conviction, thus violating his right to due process and a fair trial.

For the reasons that follow, we recommend that the writ be denied and the petition dismissed.

<u>BACKGROUND</u>

I. <u>Prior Proceedings</u>

The charges against Santana stemmed from a series of incidents that occurred in January and February 2001. During that time

Santana had repeated contact with his ex-girlfriend, Desiree Roman, despite an order of protection prohibiting him from communicating with her. Many of the charges arose from the aftermath of an encounter between Santana and Roman in Roman's apartment on February 12, 2001, and incidents occurring the following day, February 13, 2001, when Santana contacted Roman again, drove to her parents' house to see her, and subsequently became involved in a car chase with the police that resulted in injuries to several police officers.

Following his arrest, Santana was charged with numerous crimes. Based on Santana's contact with Roman he was charged with criminal contempt in the first degree, burglary in the first and second degrees, aggravated criminal contempt, endangering the welfare of a child, and stalking in the first degree. For his conduct during the car chase, he was charged with intentional assault, depraved-indifference assault, assault in the second degree, and reckless endangerment in the first degree. Finally, he was charged with criminal possession of a controlled substance in the fifth degree for substances found in his car after the chase.

Santana's trial began on January 9, 2003. We summarize the record that is relevant to Santana's claims, noting major factual disputes.

3

A. <u>Petitioner's Trial</u>

_____

_____i. <u>About the Incident</u>

An order of protection was issued against Santana on January 11, 2000, directing him not to have any contact with Roman. (Trial Tr. ("Tr.") 1568). Various witnesses, including Roman, Roman's mother, and Roman's daughter, testified at trial that in January and February of 2001, Santana contacted Roman numerous times, threatened her and her family, vandalized her apartment, kicked her, and attempted to drive her off the road, all in violation of that order. (<u>Id.</u> at 5-9, 80-82, 119-27, 142-46). Roman, Roman's daughter, and a police officer called to the scene further testified that on February 12, 2001, Santana entered Roman's apartment through the fire escape while her children were in the apartment, dragged her into the bedroom, and beat her badly. (<u>Id.</u> at 40, 82-87, 130-35). Roman went to the hospital to be treated for her injuries, and when she was released that same night she went to her parents' house with her children. (<u>Id.</u> at 11-15, 89, 135-37).

The next day, February 13, 2001, Santana repeatedly called Roman at her parents' house, telling her among other things that he was coming over. (<u>Id.</u> at 140-41). These calls prompted Roman to call Detective Teresa Harty, who had previously worked with Roman

and Santana regarding domestic-violence issues. (Id. at 140-41, 374-77). Harty then called Santana and tried to convince him to turn himself in, but he refused. (Id. at 382, 1156).

As a result of Santana's calls to Roman, Sergeant James Mastricovo and other police officers were dispatched to Roman's parents' house. (Id. at 140, 245-46, 379). When Santana called the house again, Mastricovo answered the phone and told Santana to surrender. (Id. at 251-52). According to Mastricovo, Santana called multiple times, and told Mastricovo that the police could never catch him and that he was heading to Roman's parents' house to "finish the job." (Id.). Following their phone conversations, Mastricovo called more officers to the scene. (Id. at 254).

Sergeant Philip Farrell, one of the officers called to Roman's parents' house because of the impending situation, testified that he was patrolling the area around Roman's parents' house in an unmarked gold-colored car with some other officers. (Id. at 264-66). Farrell and the other officers were all in uniform. (Id. at 264). While driving around the area, Farrell saw Santana's car make a U-turn in front of his car, and he followed Santana's car and turned on his lights and siren. (Id. at 267-69). Santana then began driving away, trying to elude the police. (Id. at 269).

Shortly after Farrell began following Santana, he called for back-up. (Id. at 269). Multiple marked police cars with flashing lights and sirens began following Santana's car, and Farrell's gold car stopped chasing Santana. (Id. at 270-71, 1165). Santana continued driving with the police cars in pursuit, nearly hitting pedestrians and disobeying traffic rules. (Id. at 270-71, 275, 679). During the chase, Santana's car hit one of the patrol cars, causing that car to hit a pole and injuring the three officers inside. (Id. at 604-09, 678, 680-87, 708-14). The officers involved in the chase testified that Santana's car deliberately struck the police car and forced it off the road. (Id. at 544-46, 603, 678, 708).

After the collision, Santana drove on and eventually crashed his vehicle into a parked car. (Id. at 1173-74). Santana then exited his car, ran into a building, and hid in a maintenance closet, where officers found him and arrested him. (Id. at 563-68, 1174-75). After being taken to a police station, Santana signed a statement admitting that he had beaten Roman, that he had fled from the police, and that he had driven into the pursuing police car in order to avoid arrest. (Id. at 389-403). The officers at the precinct testified that Santana had waived his Miranda rights and voluntarily signed the statement. (Id. at 391-95). The police also conducted a search of Santana's car with his consent, and an

6

officer testified that he found crack cocaine in the center console. (Id. at 293).

In Santana's testimony, he confirmed a portion of the prosecution's story. He admitted contacting Roman and entering her apartment on February 12, but denied that he had hurt Roman that night. (Id. at 1195-96). He testified that the next day, he had wanted to "swing by" Roman's parents' house to talk to her and had called her multiple times. (Id. at 1160-61). He testified that when he called Roman's parents' house on one occasion that day, Mastricovo picked up the phone. (Id. at 1162). He admitted that he did tell Mastricovo that he would not turn himself in during this conversation, but denied that he had referred to never being caught or "finishing the job." (Id.).

As for the chase, Santana testified that he later was driving his car near Roman's parents' house, made a u-turn, saw a gold-colored car in the middle of the street, and went around the car. (Id. at 267-68, 1162-63). He said that when he reached a stop sign at the end of the block, the gold car bumped him from behind, and a man who he did not know got out of the car and starting waving a gun. (Id. at 1163). Santana reported that he then drove off, and the gold car followed him. (Id.). He testified that at that point he had feared for his life because he did not know why the man was

7

pursuing him. (Id. at 1163-64). He further testified that he continued to flee even after the marked police cars had arrived on the scene because he did not know why the police cars were following him, he still feared for his life, and he did not trust the police. (Id. at 1166-68). He admitted signing a statement after his arrest, but said that the statement was coerced. (Id. at 1183).

As for the collision between Santana's car and the marked patrol car, Santana disputed the officers' account that he had purposely hit their car, testifying that it was an accident. (Id. at 1170-72). Santana also called an accident reconstruction expert, who testified, based on a video of the incident, that another police car had hit the rear side of Santana's car intentionally, causing Santana's car to spin out of control and hit the police car in question. (Id. at 1022-23, 1026-32).

ii. Testimony about Santana's Prior Crimes

Before the trial, the prosecutor made an application to present to the jury evidence of Santana's history with Roman as well as his criminal history. (Jury Selection Tr. 292). After a hearing, the court ruled that the prosecution was limited to presenting incidents occurring on and after December 25, 2000 unless the defense opened the door to incidents prior to that date.

8

(Id. at 552-55).

During the trial, Santana's attorney cross-examined some of the police officers about their knowledge of the Patrol Guide and its rules regarding when to engage in the pursuit of a suspect. (Id. at 549-52, 611-13). When the court asked Santana's attorney about the relevance of this line of questioning, he claimed that he was trying to establish that Santana was not guilty of the reckless-endangerment charge by showing that the police, in commencing the chase, had violated the Patrol Guide and, in doing so, had created the dangerous situation. (Id. at 625-40).

The prosecution argued that the defense's questioning opened the door to Santana's criminal history prior to December 25, 2000, particularly his involvement in a previous car chase, since that history contributed to the police decision to commence the chase. (Id. at 640, 650-53). The court decided to hold off on any decision on admitting Santana's prior history, but allowed questioning of the officers about the reasoning behind the chase, saying that the door was opened as to that particular matter. (Id. at 659-63; see id. at 760-61).

Before the testimony of the commanding officer who ordered the chase, Officer Joseph Moscott, the prosecution notified the court

that Moscott had been aware of many of Santana's prior convictions, including a prior gun conviction and a prior attempted burglary conviction, when ordering the chase, and asked to question him about this knowledge. (Id. at 750, 818-20). Santana's attorney objected, stating that the jury already knew about most of Santana's relevant criminal history, and that allowing the additional testimony "is really hanging my client based on his prior record." (Id. at 821). After further discussion, Santana's attorney conferred with Santana, and then stated that Santana did not object to admitting evidence of his previously fleeing from the police, but objected to admitting evidence about other felonies. (Id. at 830-31). The court then held a hearing to determine the scope of Moscott's testimony (id. at 855-81), at which Santana's attorney again argued that the court should disallow testimony about Santana's two prior felony convictions of attempted burglary and possession of a weapon. (Id. at 855-65, 866-67). The court decided to limit the proffered testimony from Moscott about Santana's criminal history, allowing only testimony about Moscott's knowledge of the situation with Roman from the day before, prior domestic violence incidents, and a prior gun conviction. (Id. at 868-70). During the discussion, Santana addressed the court, saying "I don't mind. I don't mind at all. You could bring up I was convicted for a gun in 1994. I don't got a problem with that." (Id. at 870).

10

Moscott then testified before the jury that Santana "had an extensive criminal history which included involvement in a lot of violent crimes and among them, the possession of a gun" (id. at 885), and that he had relied on that information in ordering the chase. (Id. at 886-89).

Before this testimony the court instructed the jury that Moscott's references to Santana's prior history were not admissible for truth but were admissible only to establish Moscott's understanding of the situation -- in effect, to explain why he authorized the chase. (Id. at 883). After Moscott's testimony, Santana's attorney moved for a mistrial, partially on the ground that Moscott had gone beyond the allowed testimony in talking about Santana's criminal history, but the court denied the application. (Id. at 898-901).

iii. <u>Jury Instructions at Issue</u>

The court ultimately put the following charges before the jury: criminal contempt in the first degree (counts 1-2, 5, 10), burglary in the first degree and second degree (counts 3-4), aggravated criminal contempt (count 6), endangering the welfare of a child (counts 7-8), stalking in the first degree (count 9), intentional assault (counts 11, 14), depraved-indifference assault

11

(counts 12, 15), assault in the second degree (counts 13, 16), reckless endangerment in the first degree (count 17), and criminal possession of a controlled substance in the fifth degree (count 18). Petitioner targets a number of the instructions that the judge gave the jury in connection with these charges.

    a. <u>The Justification Charge</u>

At the conclusion of the evidence, Santana's attorney requested a justification charge as a potential defense to the assault and reckless-endangerment charges arising from the police chase. In making this request he argued that Santana had seen the man in the gold car with a gun and developed an objective and subjective fear for his life, and that that mindset had motivated his actions during the rest of the chase. (<u>Id.</u> at 1334, 1341-61). The court noted that while Santana may have had a fear of the gold car, once the marked police cars came on the scene, based on Santana's testimony[1] there was no direct threat by the police to Santana, as required under New York law for a justification defense. (<u>Id.</u> at 1393-94).

_____

[1] During the trial, before Santana testified, the court asked Santana's attorney about his questioning of the police officers about the chase and the Patrol Guide (Tr. 625-38), an issue discussed <u>infra</u>. Based on this conversation, the court warned Santana's attorney that, depending on the substance of Santana's testimony, Santana might not be able to use a justification defense. (<u>Id.</u> at 878-81).

12

After further argument, the court concluded that Santana was not entitled to invoke the version of the justification defense defined by N.Y. Penal Law § 35.05(2), which defense counsel had cited.[2] (Id. at 1422). The court reasoned that the defendant had refused to turn himself in on the phone to two police officers that day and had told the police that they would have to chase him to arrest him, and that Santana's "subsequent flight at a time when putting the officer in the unmarked car together with the other officers was an attempt to evade a legal arrest." (Id. at 1423-24). The court also found that any fear, either generalized or particular to the unmarked car acting in concert with the marked patrol cars, "was created by the defendant's own conduct." (Id. at 1424-25). Finally, the court found that the other version of the justification defense that had been briefly discussed, N.Y. Penal Law § 35.27, did not apply either.[3] (Id. at 1425-26).

---

[2] We discuss this statute in more detail when addressing Santana's claims infra.

[3] N.Y. Penal Law § 35.27 reads: "A person may not use physical force to resist an arrest, whether authorized or unauthorized, which is being effected or attempted by a police officer or peace officer when it would reasonably appear that the latter is a police officer or peace officer." New York courts have held that this statute "does not preclude a defendant from claiming justification to resist an unprovoked police attack or excessive police force." People v. Degondea, 269 A.D.2d 243, 245, 705 N.Y.S.2d 20, 23 n.3 (1st Dept. 2000).

The court here held that this version of the justification defense did not apply because Santana "could not resist arrest" in his case since the arrest was "legitimate" because he had admittedly violated of the order of protection, and because

Notwithstanding the court's decision not to allow Santana to argue justification on the element of causation for the assault counts, the court instructed the jury on causation in a manner that noted the State's burden to show that the defendant caused the car crash and injuries to the officers and no intervening independent event brought about the result. Thus it stated:

> Cause means that the behavior of the defendant . . . resulted in [the officers'] injuries. And that injury to [the officers] was a reasonable foreseeable consequence of the series of events that were begun by the defendant.
>
> The defendant's intentional acts do not have to be the direct, immediate or last act to result in the injuries.
>
> The defendant's action need not be the sole cause of the injury as long as the defendant's conduct was an actual contributing cause to the injury . . . .
>
> [T]he defendant has asserted an intervening independent act that led to [the officers'] injuries, . . . [which] means that the injuries [to the officers] resulted from acts that were independent and separate from the act committed by the defendant, and were not foreseeable as consequences of the defendant's conduct.
>
> The People must disprove that the intervening independent act . . . led to [the officers'] injuries. The defendant has no burden to show that there was an intervening independent act . . . .

(Id. at 1607-08, 1611-13, 1617-18, 1620-22).

---

"there was no use of excessive force." (Tr. 1425).

b. <u>Patrol Guidelines</u>

Multiple police witnesses were asked during the trial by both the prosecution and the defense about the Police Department's Patrol Guide and whether the police had complied with its rules in the chase. (<u>Id.</u> at 549-52, 611-13, 688, 887, 914). The court indicated to the attorneys in early discussions, before all testimony had been concluded, that the policies of the Department and the Patrol Guide were irrelevant as to the causation of the chase and the crash because, based on the testimony thus far, Santana had created the danger by commencing the chase, and under New York law the subsequent acts of the police were not probative. (<u>Id.</u> at 824-29). After all the witnesses aside from Santana had testified, the court again indicated that it would instruct the jurors that "the Patrol Guide is irrelevant unless something happens with the defendant's testimony tomorrow." (<u>Id.</u> at 1138).

During the charge conference after the conclusion of the evidence, the court and the attorneys began discussing how to instruct the jury as to the testimony about the Patrol Guide. Santana's attorney indicated that he planned to argue in summation that the unmarked police car initially ramming Santana's car was an intervening event, and that the defendant therefore could not be found to have caused the subsequent crash that injured the

officers. (Id. at  1431-33). However, the court decided that
Santana's attorney could not make that argument, as the court would
instruct the jury that "even intentional conduct can be the
consequence of a chain of events created by the defendant . . . and
the violation of the patrol guide is irrelevant on this issue."
(Id. at 1438). Citing New York law, the court stated that "if in
fact[] an act is absolutely prohibited, but it takes place because
a chain of events set it in motion, and it was foreseeable, it
doesn't matter that there was a rule that said that this shouldn't
happen. There is no connection." (Id. at 1436-37). Justice
Bamberger therefore ruled that she would not let Santana "argue the
patrol guide on the issue of causation." (Id. at 1439).

        Santana's attorney then indicated that he might also use the
Guide to challenge the officers' credibility. (Id. at 1438). The
court ultimately allowed him to do so, instructing the jury that
the Patrol Guide "is not relevant to deciding whether the defendant
caused the injuries to the police officers or recklessly endangered
other people or the police officers. It is relevant only to the
issue of the officers' credibility." (Id. at 1630).

        c. The Instructions on Assault

        In describing the depraved-indifference version of the first-

16

degree assault charges (count 12), the court initially instructed the jury that one of the elements of the charge required that the State prove that "by the manner in which he was driving his vehicle the defendant created a substantial and unjustifiable risk that his conduct would create a grave risk that [the officers] would be killed." (Id. at 1613). Midway through the deliberations, the jury sent a note to the court asking to have the elements for two of the assault charges -- counts 11 and 12 -- read back to them, and the court again listed the elements, essentially repeating the initial charge. (Id. at 1728-40). In response to another note from the jury the same day, the court again read back the elements of count 12. (Id. at 1793-1803).

The next day the jury again asked for the elements of count 12 to be read back to them. (Id. at 1823). The court proposed to add "to the charge on the issue of reckless[ness]" that Santana could not permissibly try to escape once the police began following him, a statement consistent with the court's decision not to allow a justification defense. (Id. 1832). Santana's attorney objected, saying that the instruction constituted marshaling evidence, was "tantamount almost to a directed verdict," and would give the jury the impression that the court was looking for a particular verdict. (Id. at 1833-34). The court noted in response that "this is the third time" the jury had asked about the charge, "and the cases are

17

quite clear that when the jurors are stuck on something you have to try and enlighten them." (Id. at 1835).

The court then proceeded to give the additional instruction on the "substantial and unjustifiable risk" element of the crime, stating that

> The defendant was not permitted to try to escape from the police by driving away. You use the information about the defendant's manner of driving from the point at which the blue and white marked police cars were following him. He had no right to flee at that point. Even if you believe the defendant's testimony concerning the first car he encountered after he made the u-turn from the time the blue and white marked car enter[ed] the chase the defendant could not drive[] away.

(Id. at 1843-44). After the jurors left the courtroom, the court noted that

> The record should reflect that there were at least four jurors who responded by shaking their head and tapping the people around them . . . . So clearly there was a question in their minds about the issue of whether or not the defendant's conduct was justified or unjustified on these circumstances. And since my ruling was that there was no justification defense in this case the record speaks for itself.

(Id. at 1850-51). Santana's attorney then moved for a mistrial on the ground that the instruction "amounted to a directed verdict on that charge," and the court denied his application. (Id. at 1851).

d. Instructions Regarding Juror Conflicts

At one point during the trial, Jurors One and Two each

18

complained to the court that the other was being disruptive and rude, and the court and attorneys decided to let the jurors change their seating arrangement. (Id. at 985-91, 1005). Later, there was another incident regarding Juror One in which she purportedly refused to hold a water cup for another juror. (Id. at 1418-19). Jurors One and Two again had conflicts before the summations (id. at 1452-53), but after speaking with the court, both jurors indicated that they would not have a problem listening to and presenting their views to each other during deliberations. (Id. at 1455, 1456).

Before summations, the court gave instructions to the jury to "treat each other with great respect and listen to one another and work for the goal of resolving, if you can, the issues that have been placed before you." (Id. at 1467-68). The court again reminded the jury that

> no matter how angry you get, no matter how irritated you
> get, no matter how frustrated you get, the principle for
> jury deliberations is mutual respect. You must, must let
> each other speak. You must speak freely. You must put
> aside all personal disputes or dislikes or whatever that
> you might have of someone else.

(Id. at 1639-40).

Early in the deliberations, the jury sent a note to the court requesting that Juror One be replaced as the foreperson. (Id. at 1655). The court interviewed each juror separately, and they stated

that Jurors One and Two were again having problems, and that Juror
One was being disagreeable and was difficult to work with. (Id. at
1659-77). Nonetheless, those who were asked, including Juror One,
affirmed that they would be able to continue their deliberations
and focus on the evidence to try to arrive at a verdict. (Id. at
1660, 1662, 1664-65, 1667, 1668-69, 1670, 1672, 1677-80). At the
conclusion of the juror interviews, Santana's attorney conferred
with his client and stated that Santana's position was that he
would agree to what the court thought was best but did not have any
specific requests to deal with the situation. (Id. at 1679, 1681).
The court did not remove Juror One as the foreperson, but gave the
jurors another instruction that "the law requires that the
deliberations involve a thorough examination of the evidence, only
the evidence" and told them to "engage in discussion." (Id. at
1684-87).

Shortly after, the court received another note from Juror One,
saying that Juror Two had attempted to assault her as a result of
her voting a certain way and that she was afraid. (Id. at 1745-47).
Upon questioning, Juror Two indicated that Juror One was difficult
to deliberate with, but that she could continue the deliberations
and would listen to Juror One. (Id. at 1752-55). The court then
spoke with Juror One, who said that she did not feel as if she
could express her opinion and asked to be discharged. (1763-66,

20

1773). The court then suggested that she be relieved of her duties as foreperson to help ease the tension in the jury room, but she resisted. (Id. at 1773-76, 1783-85). The juror stated that she "would continue if [she's] not punished" by being relieved as the foreperson and if the court could assure her that Juror Two would not assault her. (Id. at 1783). At one point she said "If I voted the way [the other jurors] wanted me to . . . it would make things better" (id. at 1782); however, she indicated that she was resisting these pressures, as she said, "I'm not concentrating on anybody on the jury. I'm looking at the evidence. That's all I'm -- I'm very capable of doing that. It's important to me." (Id. at 1781). Nonetheless she insisted at several points in the conversation that she wanted to be relieved from the case, stating that she did not want to continue deliberating and wanted to go home. (Id. at 1749, 1773-74, 1778-80, 1786).

At the end of that conversation, the court concluded that Juror One seemed to imply that she could continue deliberations as long as the court did not remove her as the foreperson, and that "she's capable of deliberating in a fair way." (Id. at 1787-88). Both the prosecutor and defense counsel agreed to keep her on the jury and not remove her as the foreperson, and to go forward and let the jury continue to deliberate. (Id.). Santana himself addressed the court, saying that "it seems to me this is what trial

21

is" -- that jury disagreements are a part of the trial process -- and that he wanted the court to keep Juror One as the foreperson. (Id. at 1789-90). The court spoke again to Juror One and told her that she was going to remain the foreperson, and Juror One did not object to remaining on the jury, saying "honestly I only have a problem with that one juror. And she's the one you need to speak to." (Id. at 1790-91). The court then gave another instruction to the jury about having "respect for each other's opinions, listening to each other's opinions and focusing on basing the opinions on evidence." (Id. at 1791-92).

The same day, the court read out loud another note from the jury: "We the jury feel we will never -- underlined three times, in capital letters -- we will never be able to reach a decision on the following counts: Number six, number eleven through seventeen. We have reached a verdict on all other counts." (Id. at 1811). Counsel for both sides agreed to send the jurors home and ask them to continue deliberating the following day, and Santana also agreed to that plan. (Id. at 1811-12). All the jurors agreed to return the following day to continue deliberating. (Id. at 1814-16).

The next day, Juror One sent a note to the court saying, "I was threatened by juror number two." (Id. at 1830). Later before the court, Juror Two said "I don't know if [Juror One] brought it

22

down to you or anything. I just want to let you know I apologized to her already," and Juror One replied "It's all right. We don't have to come back downstairs to address that." (<u>Id.</u> at 1849).

That afternoon the jury sent more notes to the court. One said that Juror One "[h]as no intention of deliberating stating that she will not change her vote today tomorrow or next year regardless of what the evidence or the Judge says . . . . In conclusion we have no more reason to continue deliberating this case." (<u>Id.</u> at 1859). Another note, however, asked for more detail about specific counts. (<u>Id.</u>). The note regarding Juror One was timed on the record as coming twenty minutes before the note asking about the counts, although there was some discussion amongst the attorneys about the accuracy of these times. (<u>Id.</u> at 1860).

The court, noting that "it appears that [the jury] is actually discussing the issues," answered the juror's questions on the charges, and then gave them another instruction about their deliberations, reminding them of the time and energy that they had spent on the discussions and saying, "You have new information now as a result of your questions. It may help you to move the discussions along . . . . I urge you to please continue your work." (<u>Id.</u> at 1862, 1873). That same day, the jury reached its verdicts, with all the jurors affirming that they had agreed to the verdicts.

23

(Id. at 1876-80).

    iv. <u>Conviction and Sentencing</u>

       The jury returned a verdict of guilty on the following counts: four counts of criminal contempt in the first degree (counts 1-2, 5, 10), one count of aggravated criminal contempt (count 6), two counts of endangering the welfare of a child (counts 7-8), one count of stalking in the first degree (count 9), two counts of assault in the first degree (counts 12, 15), two counts of assault in the second degree (counts 13, 16), and one count of reckless endangerment in the first degree (count 17). On March 24, 2003, the court sentenced Santana, as a second violent felony offender, to twenty years on each of the assault counts and the maximum sentence on the other counts (Sentencing Tr. 53-56), resulting in an aggregate sentence of approximately twenty-three to forty years. (Aff. of Alexis Pimentel, Assistant District Att'y ("Pimentel Aff.") ¶ 4).

    B. <u>Further State Court Proceedings</u>

       In September 2004, Santana, through assigned appellate counsel, appealed his conviction to the Appellate Division, First Department. On that appeal he argued (1) that the conflicts between

the jurors had mandated that the trial court accept a partial
verdict or declare a mistrial; (2) that he had been denied his
right to present a defense when the court refused to provide a
justification charge, issued a supplemental instruction on the
assault charge during deliberations, and instructed the jury that
the Patrol Guide was irrelevant; (3) that the court had erred in
ruling that Santana's cross-examination of police witnesses had
opened the door to his prior gun conviction; and (4) that Santana's
sentences for his first-degree assault convictions should be
reduced. (Pimentel Aff. Ex. 1).

The Appellate Division unanimously affirmed Santana's
conviction and sentence in March 2005. People v. Santana, 16 A.D.3d
346, 346, 792 N.Y.S.2d 71, 72 (1st Dept. 2005). Regarding the trial
court's refusal to charge a justification defense, the Appellate
Division held that:

> Viewing the evidence, including defendant's testimony
> explaining his flight from the police, in the light most
> favorable to defendant, there was no reasonable view of
> the evidence that the situation was "occasioned or
> developed through no fault of" defendant, or that,
> regardless of his asserted suspicions about the unmarked
> police car, defendant also needed to flee from the marked
> cars. Since Penal Law § 35.05 (2) is objective, not
> subjective, defendant's generalized distrust or fear of
> the police was not a basis for submission of the
> emergency justification doctrine.

Id. at 346-47, 792 N.Y.S.2d at 72 (internal citations omitted). The
court further held that the trial court's supplemental charge

25

during jury deliberations on the depraved-indifference assault charge was a "correct statement of law," and was proper "since the jury was clearly in need of additional guidance." Id. at 347, 792 N.Y.S.2d at 72. Additionally, the court held that the trial court had "properly instructed the jury that even if the police pursuit of defendant may have violated the Patrol Guide, such violation did not constitute an independent intervening act. It was highly foreseeable that, in order to stop defendant, the police might engage in some dangerous maneuvers." Id.

As for Santana's attack on the admission of his past conviction, the Appellate Division held that:

> The court properly exercised its discretion in permitting a police officer to mention briefly defendant's prior weapon possession conviction, since this testimony helped explain why the Police Department authorized a dangerous, high-speed chase. The court had permitted defendant to raise an issue as to the propriety of the police conduct to the extent it affected police credibility, and the People were entitled to refute defendant's contentions. The probative value of this evidence outweighed its prejudicial effect.

Id. at 347, 792 N.Y.S.2d at 72-73.

The court went on to hold that Santana's remaining claims -- that the jury conflicts mandated accepting a partial verdict or declaring a mistrial and that his sentence should be reduced -- were unpreserved, and would not be considered in the interest of justice. Nonetheless, the panel stated that "[w]ere we to review

26

these claims, we would reject them." Id. at 347, 792 N.Y.S.2d at 73.

In July 2005, the New York State Court of Appeals denied Santana's application for leave to appeal. People v. Santana, 5 N.Y.3d 794, 794, 801 N.Y.S.2d 814, 814 (2005).

In March 2006 Santana moved pro se before the trial court to vacate his conviction pursuant to N.Y. Crim. Proc. Law § 440.10. In support of that application, he claimed that his trial counsel had denied him effective representation by virtue of his failure to object "to the trial court coercing the jury into a verdict" rather than accepting a partial verdict or declaring a mistrial. (Pimentel Aff. Ex. 3). The court denied the motion, finding that "[t]he entire issue of the breakdown in juror deliberations was raised and decided on appeal. There is no basis here to find ineffective assistance of counsel based on the same claim." (Id. Ex. 5). In August 2006 the Appellate Division denied Santana's application for leave to appeal the denial of his section 440.10 motion. (Id. Ex. 6).

II. The Current Petition

On September 13, 2006, Santana filed his current habeas

petition. As noted, he reiterates his Sixth Amendment claim from his section 440.10 motion, challenges the trial court's purported coercion of the jury and its failure to declare a mistrial or accept a partial verdict, attacks the trial court's jury instructions as he did on his appeal, and also repeats his objection to the testimony about his prior firearm conviction. Respondent opposes the petition, arguing (1) that the state court's ruling that Santana had received effective assistance of counsel was neither contrary to, nor an unreasonable application of, Supreme Court law; (2) that the Appellate Division's ruling that he was not entitled to a justification charge was neither contrary to, nor an unreasonable application of, Supreme Court law because he was not entitled to the charge under state law; (3) that Santana's challenge to the supplemental instruction about the depraved-indifference assault charge is not cognizable on habeas review because it was an accurate statement of state law; (4) that Santana's claim that he was denied a defense when the trial court refused to admit the Patrol Guide is meritless because he was allowed to cross-examine all of the officers who testified about the Guide; and (5) that Santana's claim about the admission of his gun conviction is meritless because it was relevant to explaining the authorization of the car chase and because Santana himself did not object to its introduction into evidence. (Resp't's Mem. 5-26). Alternately respondent asserts that any trial-court errors were

harmless. (Id. at 26).


# ANALYSIS


I. Standard of Review


A federal court may grant a writ of habeas corpus to a petitioner in state custody on an issue adjudicated on the merits by the state courts only if the state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The two clauses in subsection (1) require different analyses:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "The focus of the [unreasonable application] inquiry is on whether the state court's application of clearly established federal law is objectively

29

unreasonable," and courts have emphasized that "an unreasonable application is different from an incorrect one." Bell v. Cone, 535 U.S. 685, 694 (2002); see also Lynn v. Bliden, 443 F.3d 238, 240 (2d Cir. 2006) (finding state court application of clearly established federal law objectively reasonable and denying writ); Jones v. Stinson, 229 F.3d 112, 121 (2d Cir. 2000) ("As a habeas court, however, our review is limited to whether the appellate division's ruling was objectively reasonable, not whether it was correct.").

II. Ineffective Assistance of Counsel

Santana first asserts that his trial counsel failed to object to the trial court's purported coercion of the jury and its refusal to accept a partial verdict or declare a mistrial, and he asserts that these omissions amounted to ineffective assistance of counsel. (Pet'r's Mem. 12-19). According to Santana, "counsel was ill-prepared and unfamiliar with the basic principles of preservation," and his counsel should have "proficiently challenge[d] the court's denial of a mistrial" or "place[d] appropriate objections on the record."[4] (Id. at 13, 15). Respondent argues that the state court

---

[4] Santana also argues that his attorney should have "ultimately [sought] a CPL § 330.30(2) motion." (Pet'r's Mem. 15).

N.Y. Crim. Proc. Law § 330.30(2) provides that "after

rejection of this claim was neither contrary to nor an unreasonable application of Supreme Court precedent. (Resp't's Mem. 6).

The Supreme Court has established a two-part test for evaluating claims of ineffective counsel: (1) counsel's performance must be shown to have been deficient; and (2) that deficiency must be shown to have prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To satisfy the first element, the petitioner must demonstrate "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. It bears emphasis that this standard is quite deferential, and that a claim of constitutional dimension does not arise unless a lawyer's error is so egregious as to amount to a failure to provide reasonable professional representation. See Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005); Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997). Thus, a habeas court weighing an ineffective-assistance claim "must judge the reasonableness of

---

rendition of a verdict of guilty and before sentence," a defendant may make a motion to set aside or modify the verdict on the grounds that "during the trial there occurred, out of the presence of the court, improper conduct by a juror, or improper conduct by another person in relation to a juror, which may have affected a substantial right of the defendant and which was not known to the defendant prior to the rendition of the verdict."

This section does not apply to Santana's trial, as he and his counsel were both present during the discussions about the conflicts among the jurors, and Santana does not present evidence of other improper conduct by a juror that was unknown to him at trial.

counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and must "determine whether, in light of all the circumstances, . . . [counsel's] acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; accord, e.g., Loliscio v. Goord, 263 F.3d 178, 192 (2d Cir. 2001). In making this determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

To satisfy the second prong, the petitioner must establish that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable," id. at 687, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Brown, 124 F.3d at 79-80; accord, e.g., Henry, 409 F.3d at 62-64; Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004). Santana fails to satisfy either part of his Sixth Amendment claim.[5]

---

[5] In making this argument, as well as throughout the rest of his brief, Santana cites numerous state-law cases, and he also makes a specific claim that he was deprived of his state constitutional right to effective assistance of counsel. (Pet'r's Mem. 19). We note that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States" and not whether it violated state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Santana does not point to any evidence that overcomes the presumption that his attorney exercised reasonable professional judgment in all pertinent respects. Throughout the trial, Santana's attorney was actively engaged in the proceedings, making objections on many issues discussed during the trial, including those raised in Santana's current petition, and specifically pausing the proceedings many times to note his objections for the record. (Tr. 821, 830-31, 1426, 1833-34). He even made two applications for a mistrial on issues unrelated to the juror conflicts during the trial. (Id. at 898-99, 1851).[6]

With regard to the particular issue that Santana raises, his attorney participated fully in the multiple discussions pertaining to the conflicts between the jurors (id. at 990-91, 1419, 1453, 1679-81, 1787-89, 1812, 1861-62), and even conferred with Santana to ascertain his own opinion about the jury issues. (Id. at 1679). These actions during the trial plainly do not constitute the "oversight, carelessness, ineptitude or laziness" required to satisfy the performance prong, Eze v. Senkowski, 321 F.3d 110, 113 (2d Cir. 2003), and thus Santana has not shown that his attorney's

---

[6] These applications for mistrial were based on the court's admitting testimony about Santana's prior gun conviction and the court's additional charge to the jury on the assault count, and were both denied. (Id. at 898-99, 1851).

33

performance was deficient. Moreover, Santana's critique assumes that his attorney would have had a valid basis for objecting to the court's handling of the dispute between Juror One and the other jury members, as assumption that is not borne out by the record (as we explain below). The failure of a lawyer to invoke meritless objections cannot constitute constitutionally deficient performance. See United States v. Regalado, 518 F.3d 143, 150 n.3 (2d Cir. 2008) ("Failure to make a meritless argument does not amount to ineffective assistance.").

Still more importantly, Santana cannot show prejudice. The Appellate Division, in considering Santana's claims about the jury deliberations, found that they were unpreserved, but also noted that, "[w]ere we to review these claims, we would reject them." Santana, 16 A.D.3d at 347, 792 N.Y.S.2d at 73. Therefore, Santana's trial attorney's failure to object during trial or file a subsequent 330.30 motion did not prejudice Santana, because even if the claims had been preserved for appeal, the Appellate Division would have denied them on the merits. See United States v. Habbas, 527 F.3d 266, 274 (2d Cir. 2008) (finding no prejudice where counsel's failure to object "made no difference" in the outcome); United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999).

III. <u>The Coerced-Jury Claims</u>

Santana also argues that his rights to due process and a fair trial were violated when the trial court "coerc[ed] a verdict from the jury," failed to accept a partial verdict, did not declare a mistrial, and gave a defective <u>Allen</u> charge. (Pet'r's Mem. 20-36). He claims that the jury's "continued deliberations and ultimate verdict were rendered without any assurance that each juror retained his or her conscientiously held belief" and that the jury deliberations "were not properly focused on the evidence." (<u>Id.</u> at 21, 22). Respondent argues that these claims are procedurally barred from habeas review, and that, at any rate, they lack merit because the jury was not coerced and the jurors indicated that they would deliberate and decide the case on the evidence. (Resp't's Mem. 7-10).

A. <u>Procedural Default</u>

A habeas court ordinarily may not review a federal claim that was rejected by the last state court to consider it if the state court's decision rested on a "state law ground that is independent of the federal question and adequate to support the judgment." <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991); <u>see</u> <u>also</u> <u>Jimenez v. Walker</u>, 458 F.3d 130, 136 (2d Cir. 2006) (citing <u>Harris v. Reed</u>,

489 U.S. 255, 260 (1989)). The ground relied on by the Appellate
Division in rejecting Santana's jury-related claims was both
independent and adequate.

"A state court procedural default will bar habeas review when
'the last state court rendering a judgment in the case clearly and
expressly states that its judgment rests on a state procedural
bar.'" Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) (quoting
Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996)). As noted, the
First Department in this case explicitly determined that Santana's
claims that the court should have declared a mistrial or accepted
a partial verdict and that the court gave an improper Allen charge
had been unpreserved at trial.[7] 16 A.D.3d at 347, 792 N.Y.S.2d at

---

[7] We note that while Santana's attorney never moved for a
partial verdict or a mistrial on the issue of jury coercion,
during a colloquy with the court after the jury sent the note
indicating that Juror One would no longer deliberate, he did
state that "I guess at some point sending them back [be]comes
oppressive. I don't know if we have reached that point. At some
point it does become that way." (Tr. 1861). He then stated that
he had "no objection to giving some sort of Allen Charge at this
point," since the jurors were "indicating at this point that
they're deadlocked," to which Justice Bamberger replied, "I don't
think an Allen Charge is going to help you. It appears they're
actually discussing this," referring to the subsequent note from
the jury asking for clarification of certain charges. (Id. at
1862-63). The court and the attorneys then continued to discuss
how to answer the jury's questions about the charges, and
Santana's attorney did not bring up the issue of an Allen charge
again and did not object to the court asking the jurors to
continue deliberating.

This brief mention of an Allen charge is not sufficient to
constitute preservation of the issue, but even if it were,

73. Thus the decision rested on an independent state-law ground.[8]

The Appellate Division's conclusion that petitioner's claims were unpreserved also clearly rested on a ground that was "adequate." To be "adequate," a state procedural requirement must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." Murden, 497 F.3d at 192 (quoting Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)); see James v. Kentucky, 466 U.S. 341, 348-49 (1984); Cotto v. Herbert, 331 F.3d 217, 239 (2d Cir. 2003) (quoting Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999)). The state procedural requirement at issue in petitioner's case is the contemporaneous-objection rule embodied at N.Y. Crim. Proc. Law § 470.05(2), which allows for preservation of a claim if a party makes a specific protest at a time when the trial court has an effective opportunity to correct an error. That rule has long been recognized as a settled and legitimate requirement under New York

_____

Santana's claim regarding an improper Allen charge would fail on its merits, as discussed infra.

   [8] The fact that the panel also stated that the claims were meritless does not alter this conclusion. A state-court decision will be deemed to rest on state-law grounds even if the court, after invoking a state procedural ground, proceeds in the alternative to address the merits, as is the case here. See Harris, 489 U.S. at 264 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding."); Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007); Green, 414 F.3d at 294.

law. <u>See</u>, <u>e.g.</u>, <u>Garcia</u>, 188 F.3d at 79-82. As Santana himself notes in pressing his Sixth Amendment claim, neither he nor his attorney asserted objections or pursued his current arguments before the trial court. In fact, during one of the longer discussions that followed the request of Juror One to be taken off the jury, Santana himself said to the court that "this is what trial is" and did not object to the continuation of juror deliberations. (Tr. at 1789). Hence, the Appellate Division was entirely justified in holding that Santana's claims were unpreserved.

Given this procedural forfeiture in state court, we may not review the merits of these claims unless petitioner can overcome his procedural default by "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750; <u>see also</u> <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d 804, 809 (2d Cir. 2000). He cannot satisfy either test.

To establish cause, Santana must demonstrate that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule," for example, by showing that the factual or legal basis for a claim was not reasonably available to counsel or that some interference by officials made

38

compliance impracticable. <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986) (citing <u>Reed v. Ross</u>, 468 U.S. 1, 16 (1984) and <u>Brown v. Allen</u>, 344 U.S. 443, 486 (1953)). Santana cannot show cause, as nothing prevented his attorney from asserting objections to the continuation of jury deliberations during the trial.[9]

Santana is also unable to show that a failure to address these claims would result in a fundamental miscarriage of justice. That exception is reserved for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Murray</u>, 477 U.S. at 496; <u>see also Sawyer v. Whitley</u>, 505 U.S. 333, 339 n.6 (1992). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." <u>Schlup v. Delo</u>, 513 U.S. 298, 324 (1995). As Santana proffers no evidence of innocence, either new or offered at trial, and since there was overwhelming trial evidence of his guilt, he cannot demonstrate any fundamental miscarriage of justice. <u>See</u>, <u>e.g.</u>, <u>De Jesus v. Miller</u>, 323 F. Supp. 2d 547, 550-51 (S.D.N.Y. 2004).

_____

[9] While the Supreme Court has found that an ineffective-assistance-of-counsel claim can be cause for procedural default, <u>see</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986), as noted above, Santana cannot show ineffective assistance of counsel and thus he cannot show cause on this ground either.

Accordingly, Santana's procedural default dictates that his claims regarding the jury deliberations be deemed procedurally barred and dismissed on that basis.

B. <u>Merits of the Jury Claims</u>

Even if we ignored the procedural bar, the result would not change, since Santana's arguments on the jury-related claims lack merit. Santana claims that his constitutional right to due process and a fair trial was violated when the trial court failed to accept a partial verdict or declare a mistrial, and when it supposedly coerced a verdict from the jury at least in part based on a defective <u>Allen</u> charge.

A mistrial is appropriate when there is a showing of "manifest necessity." <u>Winston v. Moore</u>, 452 U.S. 944, 944 (1981) (citing <u>United States v. Perez</u>, 9 Wheat. 579 (1824)); <u>see also</u> <u>United States v. Razmilovic</u>, 507 F.3d 130, 136-37 (2d Cir. 2007); <u>United States v. McDaniel</u>, 2004 WL 1057627, at *4 (S.D.N.Y. May 10, 2004) ("[M]istrial is appropriate only where, taking all of the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise have been defeated"). "The test as to what constitutes manifest necessity is not susceptible to any mechanical formula, but rather, must be

evaluated according to the facts and circumstances of each particular case." United States v. Millan, 817 F. Supp. 1086, 1088 (S.D.N.Y. 1993).

The Supreme Court has emphasized the importance of appellate deference on a mistrial decision, and has held that

> [t]here are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. He has seen and heard the jurors during their voir dire examination. He is the judge most familiar with the evidence and the background of the case on trial.

Arizona v. Washington, 434 U.S. 497, 513-14, (1978); see also Wade v. Hunter, 336 U.S. 684, 689 (1949) ("When justice requires that a particular trial be discontinued is a question that should be decided by persons conversant with factors relevant to the determination."). The Supreme Court has also repeatedly observed that "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." Uttecht v. Brown, 551 U.S. 1, 127 S.Ct. 2218, 2224 (2007); see also United States v. Grasso, 600 F.2d 342, 343 (2d Cir. 1979).

In following this caselaw, the Second Circuit gives a trial court's mistrial ruling "great deference irrespective of any statement of reasons by the trial court," United States v.

41

<u>Ruggiero</u>, 846 F.2d 117, 123 (2d Cir. 1988), observing that "when
unforeseen events intrude into the trial, the trial judge's
decision whether manifest necessity exists to declare a mistrial
should be afforded the 'highest degree of respect.'" <u>Corey v. Dist.
Court of Vermont</u>, 917 F.2d 88, 90 (2d Cir. 1990) (quoting
<u>Washington</u>, 434 U.S. at 511); <u>see also</u> <u>Dunkerley v. Hogan</u>, 579 F.2d
141, 145 (2d Cir. 1978). An appellate court may disturb a trial
court's decision on a mistrial application only when "the exercise
of its discretion is clearly an abuse." <u>Dawson v. Phillips</u>, 2008 WL
818539, at *8 (S.D.N.Y. Mar. 25, 2008). Furthermore, "[c]hallenges
based on the behavior of jurors during their deliberations not
involving contact with outside parties," as here, "receive less
judicial solicitude than those based on outside influence."
<u>Middleton v. Ercole</u>, 2007 WL 4264578, at *7 (E.D.N.Y. Dec. 3, 2007)
(citing <u>Tanner v. United States</u>, 483 U.S. 107, 120, 127 (1987))
(finding no habeas claim when petitioner said he was entitled to
mistrial because one juror refused to deliberate). Given the broad
discretion invested in the trial judge in determining applications
for a mistrial or inviting a partial verdict -- which is
essentially a mistrial on some of the charges, <u>see</u>, <u>e.g.</u>, <u>United
States v. DiLapi</u>, 651 F.2d 140, 146-47 (2d Cir. 1981);
<u>see</u> <u>generally</u> <u>Razmilovic</u>, 507 F.3d at 139[10] -- the Appellate

---

[10] Complaints by defendants about the trial court's handling
of a possible partial verdict more commonly criticize the judge
for accepting such a verdict. <u>See</u> <u>Spears v. Greiner</u>, 459 F.3d

Division's affirmance on this issue was neither contrary to, nor an unreasonable application of, Supreme Court law.

In asserting his claim that the trial court should have declared a mistrial or accepted a partial verdict, Santana argues that there was a "complete breakdown in jury deliberations," citing the conflicts between Juror One and the other jurors as well as the two deadlock notes the jury submitted to the court. None of these instances show an abuse of discretion by the trial court in deciding not to declare a mistrial or accept a partial verdict.

Throughout the course of the discussions about jury discord, all of jurors questioned by the court -- including Jurors One and Two, the jurors who had the most conflicts with one another -- affirmed that they could continue to deliberate fairly in the case. (Tr. 1005, 1455-56, 1660-80, 1752-55, 1849). Additionally, though Juror One stated at one point that she was scared of Juror Two and wanted to be relieved from the case, the court had an extensive discussion with Juror One during the course of which Juror One

---

200, 202-03 (2d Cir. 2006); McPherson v. Greiner, 2003 WL 22405449, at *23-24 (S.D.N.Y. Oct. 22, 2003); Bordas v. Walker, 2000 WL 1867915, at *4 (S.D.N.Y. Dec. 20, 2000). The determination whether to accept a partial verdict is ordinarily governed by state law, N.Y. Crim. Proc. Law § 310.70, and no constitutional question is implicated unless the defendant can demonstrate that the judge coerced such a verdict. See, e.g., McPherson, 2003 WL 22405449, at *23-24. For reasons described in the text, that was not the case here.

indicated that she wished to stay on the jury if she remained as
foreperson and assured Justice Bamberger that she would deliberate
fairly if she were not removed as foreperson. (Id. at 1763-88).
Furthermore, once the court notified Juror One that it was keeping
her as foreperson, she agreed to remain on the jury and continued
in the deliberations. (Id. at 1789-91).

The court also repeatedly instructed the jurors to respect and
listen to each other's opinions and to focus on the evidence. (Id.
at 1467-68, 1639-40, 1684-87, 1791-92). As the Supreme Court has
noted, courts "generally presume that jurors follow their
instructions." Penry v. Johnson, 532 U.S. 782, 799 (2001) (citing
Richardson v. Marsh, 481 U.S. 200, 211 (1987)). This presumption
becomes still stronger when, as in petitioner's trial, the jurors
affirm their compliance with the given instruction. See Weeks v.
Angelone, 528 U.S. 225, 234 (2000) (presuming that jury followed
instruction on claim of jury instruction error, and finding that
the presumption "gain[ed] additional support" when the jurors
affirmed in open court that they had correctly followed the jury
instructions). Here, as noted, all of the jurors who were asked --
including Jurors One and Two -- affirmed that they could remain
fair and impartial after the incidents, and at the end of the trial
each juror affirmed that he or she agreed with the verdict. (Id. at
1876-80).

44

Santana also fails to show an abuse of discretion in the trial court's decision to ask the jurors to continue deliberating after receiving the two deadlock notes. When the court received the first deadlock note, the jury had been deliberating for a few days, but given the time the court spent addressing the conflicts between Jurors One and Two (id. at 1655-77, 1745-86) as well as early and late starts to deliberations throughout the trial (id. at 1714-17, 1719), the jurors had been discussing the charges for a relatively short period of time. As a result, the court told the jurors in response to its note that "it is my view that your consideration of the counts . . . has not been sufficient under the circumstances, considering the length of this trial, the amount of evidence there is, the amount of time that we've spent in the courtroom with either colloquy with individual jurors or read back," and it asked them to return the next day, a request to which they all agreed. (Id. at 1812-16). The second deadlock note, indicating that Juror One was refusing to deliberate, was marked as being sent shortly before another note asking for clarification of some of the charges, and the court determined, based on the second note, that "it appears that [the jury] is actually discussing the issues," and instructed the jurors to keep deliberating after giving them more information about the counts. (Id. at 1862). Both times, the jurors returned to their discussions after the instructions from the court. (Id. at 1814-16, 1873-75). Thus the trial court was well

45

within its discretion in not ordering a mistrial or accepting a partial verdict, and the Appellate Division's affirmance of this decision was neither contrary to, nor an unreasonable application of, Supreme Court law.

Santana also claims that the trial court "coerced" the jury into a verdict. He relies in part on the court's refusal to declare a mistrial or order a partial verdict when Juror One expressed fear as a result of the aggressive behavior or Juror Two. For reasons already noted, this argument is baseless. Santana also cites, as a basis for his coercion claim, the instructions given by the court insofar as it supposedly told the jurors to continue to deliberate after the second deadlock note but did not tell them they should not abandon their own conscientious beliefs. This argument is also baseless.

The second deadlock note, indicating that Juror One was refusing to deliberate, was marked as being sent shortly before another note asking for clarification of some of the charges. Once the court gave the jury the requested explanations, it asked the jurors to continue deliberating in light of the new information on the charges, saying,

> You have done a huge amount of work in the past four
> days. It's really quite extraordinary how much work you
> have done. Your work is extremely important. I don't know
> if you're almost finished with your deliberations. I

don't know if you're not almost finished with your
deliberations, but I really want to encourage each of you
to participate. You have invested so much time and energy
and thought and caring and consideration that to not to
continue the discussions at this point would really be a
shame and all of your hard work would be lost . . . . I
ask you please to think about how much you have done and
how important this is, and to make every effort to
continue. You have new information now as a result of
your questions. It may help you to move the discussions
along. I will be happy to answer any questions that you
have. I urge you to please continue your work.

(Id. at 1873).


Santana attacks this supplemental charge, because the court
failed to tell the jurors to retain their conscientiously held
beliefs while instructing them to resume deliberations. (Pet'r's
Mem. 27). This claim is without merit.


The Supreme Court "approve[s] of the use of a supplemental
charge to encourage a jury reporting itself as deadlocked to engage
in further deliberations." Jones v. United States, 527 U.S. 373,
382 n.5 (1999) (citing Allen v. United States, 164 U.S. 492, 501
(1896)). This charge, often referred to as an Allen charge,
generally instructs jurors to continue deliberating and to "listen,
with a disposition to be convinced, to each other's arguments."
Allen, 164 U.S. at 501. The charge is used "to break-up the log-jam
and permit the jury to move on toward a verdict." United States v.
Crispo, 306 F.3d 71, 76 (2d Cir. 2002).

47

"The propriety of an Allen-type charge depends on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts." United States v. Ruggiero, 928 F.2d 1289, 1299 (2d Cir. 1991); see also Smalls v. Batista, 191 F.3d 272, 279 (2d Cir. 1999). When considering such a claim of coercion, a habeas court "consider[s] the supplemental charge given by the trial court 'in its context and under all the circumstances.'" Lowenfield v. Phelps, 484 U.S. 231, 237 (1988) (quoting Jenkins v. United States, 380 U.S. 445, 446 (1965) (per curiam)). Under this "totality of circumstances" test, the courts have considered such factors as whether the charge was addressed specifically to the minority jurors, whether the jurors continued to deliberate on their own after sending a deadlock note, whether the jury received more information after the charge, how soon the jury returned a verdict after the charge, and the general language of the charge, although no one factor is dispositive. See, e.g., Lowenfield, 484 U.S. at 237-38; Crispo, 306 F.3d at 77; Fong v. Poole, 522 F. Supp. 2d 642, 663 (S.D.N.Y. 2007) (finding charge improper when it "(1) overemphasized the need to get a result, (2) suggested that the jurors were failing in their duty, (3) stressed that '[s]omething happened' in the case, (4) presented jurors with the prospect of prolonged deliberations, and (5) failed to caution jurors not to surrender their conscientiously held beliefs."). Santana cannot show any coercion of a verdict in

48

his case.

First, the court's supplemental instruction may fall outside the definition of an <u>Allen</u> charge, as the Second Circuit has noted that "other courts have held that a judge's simple request that the jury continue deliberating, especially when unaware of the composition of the jury's nascent verdict, can not be properly considered an <u>Allen</u> charge." <u>Spears</u>, 459 F.3d at 204. Here, the court only asked the jury to keep deliberating and discussing the case, and even though the jury sent a note indicating that Juror One was refusing to deliberate, the court did not know what the exact vote was for the verdict.

However, even accepting Santana's characterization of the charge as an <u>Allen</u> charge, the result would not change. The Second Circuit has held that specific language, including the "conscientiously held beliefs" language that Santana cites, is not required in order for a supplemental charge to be constitutional, as each charge "must be evaluated in its context and under all the circumstances." <u>Id.</u> at 206 (citations omitted) (finding that there is no "bright-line rule that a necessary component of any Allen-type charge requires the trial judge to admonish the jurors not to surrender their own conscientiously held beliefs."); <u>see</u> <u>Early v. Packer</u>, 537 U.S. 3, 9-10 (2002) (discussing limited habeas

review of state-court jury deadlock charges). While the Second
Circuit in Smalls found a supplemental Allen charge to be
unconstitutionally coercive when the trial court failed to
"admonish the jurors not to surrender their own conscientiously
held beliefs," Smalls, 191 F.3d at 279, the court further
interpreted this holding in Spears, concluding that the Smalls
decision had held that the charge was unconstitutionally coercive
"because it both (1) obligated jurors to convince one another that
one view was superior to another, and (2) failed to remind those
jurors not to relinquish their own conscientiously held beliefs."
Spears, 459 F.3d at 206 (emphasis in original). Thus the Spears
court held that the modified Allen charge given by the trial judge
in that case was constitutional because "[w]hile [it] did not
include the specific cautionary language," it "did not urge the
jurors to listen to the views of other jurors with whom they
disagreed or attempt to persuade each other." Id.


    The supplemental charge that the trial court gave in Santana's
case after the second deadlock note is similar to the charge
discussed in Spears. It did not tell the jurors to try to convince
each other of their points of view, nor did it address a specific
juror or group of jurors. The court simply asked the jurors to
continue to deliberate, and did not indicate that the jurors would
be forced to deliberate until they agreed on a verdict or instruct

50

them to reach a specific verdict. Moreoever, the previous day the
court had instructed the jury that "[n]o one will ask you ever to
give up a conscientiously held opinion" and to "listen to one
another and treat one another with respect." (Tr. 1792). That
earlier caution further underscores the propriety of the charge.
See Spears, 459 F.3d at 206 (noting, in upholding the Allen charge,
that "the original charge, given to the jury earlier that day, did
include cautionary language telling the jurors that they had a
right to stick to their arguments"). Moreover, during two of the
colloquies the court held with the individual jurors, Juror One --
the juror singled out in the deadlock note -- affirmed that she
would concentrate on the evidence and recognized that she did not
have to "go along" with the rest of the jury and change her vote.
(Id. at 1677, 1781). Further, the jury continued to deliberate
after sending the deadlock note, and the court also gave the jury
additional information about the counts that they were considering
right before asking them to resume deliberations, circumstances
that make it even less likely that the final verdict was coerced by
the supplemental charge.

    In sum, even if these claims were not procedurally barred,
they would fail on their merits, since Supreme Court law mandates
deference to the judgment of the trial court on mistrial or
partial-verdict decisions and dictates a presumption that the jury

followed the trial court's instructions to consider the evidence and remain fair and impartial, and since the <u>Allen</u> charge was not coercive under the totality-of-circumstances test outlined by the Supreme Court.

IV. <u>Other Jury-Charge Issues</u>

A. <u>Refusal to Charge Justification Defense</u>

Petitioner next argues that the trial court's denial of his request for a justification charge violated his rights to due process and to present a defense because his testimony established that he had feared that he would be the victim of deadly force during the police chase. (Pet'r's Mem. 37-40). Respondent asserts that petitioner was not entitled to a justification charge under New York law and therefore is not entitled to habeas relief on this ground. (Resp't's Mem. 11-15).

A habeas court considering a petitioner's claim that he was denied a justification charge must answer three questions in the petitioner's favor to grant him relief: "First, was he entitled to a justification charge? Second, if so, did the failure to give one result in a denial of due process? Third, if so, did the state court's contrary conclusion constitute an unreasonable application

of clear Supreme Court law?" <u>Jackson v. Edwards</u>, 404 F.3d 612, 621
(2d Cir. 2005) (citing <u>Davis v. Strack</u>, 270 F.3d 111, 124 (2d Cir.
2001) and 28 U.S.C. § 2254(d)).


     The statute under which Santana requested a justification
defense states that

> [C]onduct which would otherwise constitute an offense is
> justifiable and not criminal when . . . such conduct is
> necessary as an emergency measure to avoid an imminent
> public or private injury which is about to occur by
> reason of a situation occasioned or developed through no
> fault of the actor, and which is of such gravity that,
> according to ordinary standards of intelligence and
> morality, the desirability and urgency of avoiding such
> injury clearly outweigh the desirability of avoiding the
> injury sought to be prevented by the statute defining the
> offense in issue.

N.Y. Penal Law § 35.05.  Under New York law, the court determines
a request for a justification charge by considering whether a
reasonable view of the evidence in the light most favorable to the
defendant supports the charge. <u>People v. Garcia</u>, 59 A.D.3d 211,
212, 873 N.Y.S.2d 52, 52-53 (1st Dept. 2009) (citing <u>People v.
Watts</u>, 57 N.Y.2d 299, 301, 456 N.Y.S.2d 677, 678 (1982)). The
justification statute has both a subjective and an objective
component, and thus "[i]t is not enough that the defendant believed
that the use of force was necessary under the circumstances; his
[or her] reactions must be those of a reasonable person similarly
confronted." <u>People v. Damanski</u>, 39 A.D.3d 1023, 1024, 834 N.Y.S.2d
385, 386 (3d Dept. 2007) (citing <u>Matter of Y.K.</u>, 87 N.Y.2d 430,

433-34, 639 N.Y.S.2d 1001, 1002 (1996)); see People v. Goetz, 68
N.Y.2d 96, 114-15, 506 N.Y.S.2d 18, 29-30 (1986).

As the trial court noted, there was no objective, reasonable
view of the evidence that would support Santana's claim that he was
justified in fleeing from the police. Santana testified that he had
feared the man in the gold car who had a gun because he did not
know that the man was a police officer. (Tr. 1163-64). Nonetheless,
once the marked police cars began pursuing him, Santana admittedly
knew that the police were following him but continued to flee, and
his conduct at that point was not objectively reasonable despite
his testimony that he did not trust the police and feared that they
were going to kill him. (See Tr. 1166-67). Compare People v.
Williams, 229 A.D.2d 604, 605, 645 N.Y.S.2d 855, 855-56 (2d Dept.
1996) (upholding denial of justification charge when plainclothes
officer identified himself as a police officer and struggled with
the defendant for control of a pistol) and People v. Angus, 192
A.D.2d 665, 666, 597 N.Y.S.2d 87, 88 (2d Dept. 1993) (affirming
denial of justification charge when officers had handcuffs and
walkie-talkies visible and the officers testified that their badges
were displayed) with People v. Nezaj, 139 Misc.2d 366, 374-75, 528
N.Y.S.2d 491, 497-98 (N.Y. Cty. Sup. Ct. 1988) (finding
justification charge should have been allowed when federal agents
acted surreptitiously, tried to conceal their presence, and

identified themselves only just before they smashed at defendant's door with a sledge hammer).

In short, the Appellate Division was entirely justified in holding that, as a matter of New York law, "the [trial] court properly refused" the request for a justification charge because "there was no reasonable view of the evidence that the situation was 'occasioned or developed through no fault of' the defendant, or that, regardless of his asserted suspicions about the unmarked police car, defendant also needed to flee from the marked cars." Santana, 16 A.D.3d at 346-47, 792 N.Y.S.2d at 72 (internal citations omitted).[11] Since Santana was not entitled to a justification charge, it follows that he cannot demonstrate that his due-process rights were violated or that the state court's conclusion constituted an unreasonable application of clear Supreme Court law, and his claim must therefore fail. See, e.g., Thomas v. Duncan, 2001 WL 1636974, at *17 (S.D.N.Y. Dec. 21, 2001) (citing Davis, 270 F.3d 123-24).

---

[11] It also bears mention that the holding of the Appellate Division -- a mid-level appellate court -- on this issue of state law is entitled to presumptive deference. See, e.g., Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C., 370 F.3d 259, 265 (2d Cir. 2004); Parron v. Quick, 869 F.2d 87, 90 (2d Cir. 1989). Petitioner offers no basis, and we are aware of none, that would justify rejecting the Appellate Division's affirmance on this state-law question.

B. <u>Instructions on the Reckless-Assault Charge</u>

Santana's next argument is that the trial court's supplemental instruction to the jury on the reckless-assault charge violated his rights to present a defense, to due process, and to a fair trial by jury. (Pet'r's Mem. 40-43). Respondent asserts that the claim is not cognizable on habeas review because the court's instruction was an accurate statement of state law. (Resp't's Mem. 16-19).

Throughout the course of its deliberations, the jury sent three separate notes asking for read-backs of the elements of the depraved-indifference first-degree assault charge. (Tr. 1728-40, 1793-1803, 1823). Noting that the jury was stuck on the elements of that charge, the court gave a supplemental instruction in which it stated that Santana was not permitted to try to escape from the police once the marked police cars began following him. (<u>Id.</u> at 1843-44). This instruction reflected a ruling the court had previously made on the issue. (<u>Id.</u> at 1422-26).

Habeas petitioners claiming a constitutional violation from a flawed jury instruction have a heavy burden, as the Supreme Court has observed that "[e]ven if there is some 'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation."

56

Waddington v. Sarausad, __ U.S. __, 129 S. Ct. 823, 831-32 (2009)

(quoting Middleton v. McNeil, 541 U.S. 433, 437 (2004)). The Court

explained:

> Rather, the defendant must show both that the instruction
> was ambiguous and that there was "a reasonable
> likelihood" that the jury applied the instruction in a
> way that relieved the State of its burden of proving
> every element of the crime beyond a reasonable doubt. In
> making this determination, the jury instruction "may not
> be judged in artificial isolation, but must be considered
> in the context of the instructions as a whole and the
> trial record." Because it is not enough that there is
> some "slight possibility" that the jury misapplied the
> instruction, the pertinent question "is whether the
> ailing instruction by itself so infected the entire trial
> that the resulting conviction violates due process."

Id. (quoting, inter alia, Estelle, 502 U.S. at 72); see also Cupp

v. Naughten, 414 U.S. 141 (1973).


Here, the Appellate Division found that the supplemental

charge was a "correct statement of law" and that the trial court

"properly exercised its discretion" in delivering the charge since

"the jury was clearly in need of additional guidance." Santana, 16

A.D.3d at 3447, 792 N.Y.S.3d at 72. Its decision on this state-law

issue was presumptively correct, and petitioner offers no basis to

question that conclusion.


As noted, the trial court's refusal to charge a justification

defense in connection with the car chase was proper, since

petitioner had no objective basis to flee from the marked patrol

cars. The challenged supplemental instruction reiterated this ruling. In addition, the supplemental charge was essentially a restatement of N.Y. Penal Law § 35.27, which states that "[a] person may not use physical force to resist an arrest, whether authorized or unauthorized, which is being effected or attempted by a police officer or peace officer when it would reasonably appear that the latter is a police officer or peace officer." The supplemental charge simply restated this law as applied to the evidence in instructing the jury that "[t]he defendant was not permitted to try to escape from the police by driving away . . . . Even if you believe the defendant's testimony concerning the first car he encountered after he made the u-turn, from the time the blue and white marked car enter[ed] the chase the defendant could not drive[] away." This was a neutral statement of the law as applied to the evidence and also reflected the prior ruling of the trial court. Petitioner puts forth no evidence that it "gave the jury a clear indication of the verdict the court wanted." (Pet'r's Mem. 41).

   Additionally, it is proper under New York law for the trial court to provide a supplemental instruction when the jury seems to need more guidance. See People v. Jones, 52 A.D.3d 1252, 1252, 859 N.Y.S.2d 544, 544 (4th Dept. 2008) ("The court has discretion to respond as it deems proper to an inquiry by a deliberating jury .

. . provided that the supplemental instruction is a meaningful response to the jury's inquiry"); People v. Footman, 31 A.D.3d 290, 290, 818 N.Y.S.2d 86, 87-88 (1st Dept. 2006); see also Sams v. Walker, 18 F.3d 167, 171 (2d Cir. 1994) (finding state court's additional charge in response to jury's question proper in denying habeas claim); Dixon v. McGinnis, 492 F. Supp. 2d 343, 350 (S.D.N.Y. 2007) (same). Further, it is also proper for trial courts to refer to the evidence "to the extent necessary to explain the application of legal principles to the factual issues." People v. Poey, 260 A.D.2d 411, 412,  689 N.Y.S.2d 509, 510 (2d Dept. 1999) (citing N.Y. C.P.L.R. § 300.10(2), which states that the court must "so far as practicable, explain the application of the law to the facts"); see People v. Rivera, 183 A.D.2d 420, 421, 584 N.Y.S.2d 1, 2 (1st Dept. 1992); see also Otero v. Eisenschmidt, 2004 WL 2504382, at *26-27 (S.D.N.Y. Nov. 8, 2004) (citing N.Y. C.P.L.R. § 300.10(2)); Brown v. Greiner, 2003 WL 22964395, at *6 (E.D.N.Y. Oct. 2, 2003) (same). Here, the trial court gave the additional instruction to the jury only after the jurors had asked for the elements of the depraved-indifference assault charge to be read back for the third time, and did so because it seemed that the jury was unable to understand the substance of the elements with sufficient clarity to apply them to the evidence. (Tr. 1728-40, 1793-1803, 1823, 1835).

Since the trial court's instruction was a clear and correct statement of the law, was within the court's discretion, and reflected a prior ruling of the court that petitioner was not entitled to a justification defense, it did not violate Santana's right to present a defense. For the same reason, neither did it "infect[] the entire trial" with unfairness, and thus necessarily it also did not violate petitioner's right to a fundamentally fair trial or to due process. See Thomas, 2001 WL 1636974, at *1 (denying habeas petition claiming violation of right to present a defense and right to due process based on failure to charge a justification defense because petitioner was not entitled to a justification defense).

C. Patrol Guide

Santana also argues that the trial court's refusal to allow him to argue on summation that a violation of the Patrol Guide was an intervening cause of the injuries to the police officers -- and hence a defense to the assault charges -- violated his right to present a defense and to confront witnesses. (Pet'r's Mem. 43-45). In response, respondent argues that Santana was able to use the Patrol Guide to attack the officers' credibility and that there was no connection between the Patrol Guide and Santana's actions. (Resp't's Mem. 20-23).

Santana's attorney indicated during the charge conference that he intended to argue to the jury that a police car had intentionally rammed Santana's car during the chase in violation of the Patrol Guide, that this was an intervening cause for the police officers' injuries from the crash, and that thus Santana could not be found to have caused the crash. (Tr. 1431-33). The court did not allow him to make this argument, stating that under New York law, even if an act is intentional and violates a rule in the Guide, if it is foreseeable based on a chain of events started by the defendant, it can be found to be caused by the defendant's actions. (Id. at 1438-39).

The Appellate Division's determination that the trial court properly instructed the jury that a violation of the Patrol Guide was not relevant on the issue of causation is presumptively correct. See Universal Acupuncture, 370 F.3d at 265. Moreover, we have no basis to reject that presumption. To the contrary, New York courts have held that a violation of the Patrol Guide cannot constitute a supervening cause if the violation was foreseeable to the defendant. See People v. Gray, 278 A.D.2d 151, 152, 717 N.Y.S.2d 596, 596 (1st Dept. 2000).[12] As the Appellate Division

---

[12] Santana also asserts in his brief that the trial court improperly relied on Desmond v. City of New York, 88 N.Y.2d 455, 646 N.Y.S.2d 492 (1996), because Desmond addressed a civil cause of action and did not apply to his case. (Pet'r's Mem. 43-44). The Desmond court found that the Patrol Guide "merely establishes

61

noted, based on the evidence at trial, "[i]t was highly foreseeable that, in order to stop [Santana], the police might engage in some dangerous maneuvers." <u>Santana</u>, 16 A.D.3d at 346-47, 792 N.Y.S.2d at 72.

While "the right to present a defense is one of the minimum essentials of a fair trial," the right "does not give criminal defendants carte blanche to circumvent the rules of evidence. Restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the criminal trial process,' and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" <u>United States v. Almonte</u>, 956 F.2d 27, 30 (2d Cir. 1992) (quoting <u>Rock v. Arkansas</u>, 483 U.S. 44, 55 (1987)); <u>see also</u> <u>Michigan v. Lucas</u>, 500 U.S. 145, 150-53 (1991). Furthermore, the Supreme Court has "acknowledge[d] also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts, . . . [as] the Constitution leaves to the judges who must make these decisions

---

a general policy" and "contains no particularized mandates," 88 N.Y.2d at 464, 646 N.Y.S.2d at 497, and Justice Bamberger cited it while making her ruling that a violation of the Patrol Guide could not be an intervening cause. (Tr. 827-28). This was a correct reading of <u>Desmond</u>, and is also supported by other decisions. <u>See</u> <u>Turini v. County of Suffolk</u>, 8 A.D.3d 260, 262, 778 N.Y.S.2d 66, 68 (2d Dept. 2004). Moreover, petitioner does not cite any authority stating that criminal courts cannot cite to or rely on civil cases. In any event the affirmance by the Appellate Division moots the argument.

wide latitude to exclude evidence that . . . poses an undue risk of harassment, prejudice, [or] confusion of the issues." <u>Crane v. Kentucky</u>, 476 U.S. 683, 689-90 (1986) (internal citations omitted).

Since the trial court's instruction to the jury on the Patrol Guide issue was a correct statement of law and served the legitimate purpose of avoiding confusion about the causation element of the assault charges, it did not violate Santana's right to present a defense. Additionally, Santana's attorney was permitted to cross-examine the testifying officers about the Patrol Guide (Tr. 549-52, 611-134, 688, 887, 914), and the court allowed the jury to consider this testimony on the issue of credibility.[13] (<u>Id.</u> at 1630). Santana was therefore also not deprived of his constitutional right to confront witnesses.

V. <u>The Molineux Claim</u>

Santana's final argument is that the trial court improperly held that his cross-examination of various police officers opened the door to testimony by Officer Moscott about petitioner's prior

---

[13] Santana's attorney indicated during the charge conference that he might argue that the fact that some of the testifying officers said that they were not familiar with the Guide despite being on the force for many years made them less credible as witnesses (Tr. 1439), but ultimately he did not make this argument during his summation.

gun conviction, and that its admission was prejudicial. (Pet'r's Mem. 45-49). Respondent asserts that this claim is not cognizable on habeas review because the evidence was needed to explain an issue brought up in cross-examination. (Resp't's Mem. 24-26).

"[A] decision to admit evidence of a criminal defendant's uncharged crimes or bad acts under Molineux constitutes an evidentiary ruling based on state law" and is ordinarily not reviewable by a habeas court. Tingling v. Donelli, 2008 WL 4724567, at *8 (S.D.N.Y. Oct. 24, 2008) (quoting Sierra v. Burge, 2007 WL 4218926, at *14-15 (S.D.N.Y. Nov. 30, 2007)). "For the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (citing Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)); see also Roldan v. Artuz, 78 F. Supp. 2d 260, 276 (S.D.N.Y. 2000). Further, "[w]here the prejudicial evidence is 'probative of [an] essential element' in the case, its admission does not violate the defendant's right to due process." Dunnigan, 137 F.3d at 125 (quoting Estelle, 502 U.S. at 69).

Santana cannot show a violation of due process in the trial

court's <u>Molineux</u> ruling. First, the gun conviction was relevant, since, as the Appellate Division held, it "helped explain why the Police Department authorized a dangerous, high-speed chase," <u>Santana</u>, 16 A.D.3d at 346, 792 N.Y.S.2d at 72, an issue that Santana's attorney had put into question during his cross-examination of several of the officers. (Tr. 549-52, 611-13). Santana's attorney represented to the court that he was eliciting information about why the chase had been authorized precisely for the purpose of showing that the police had improperly commenced the chase. (<u>Id.</u> at 625-40). Since the Patrol Guide stated that the person authorizing a chase should consider, <u>inter alia</u>, the danger posed by the fleeing suspect (<u>id.</u> at 887-88), the trial court properly found that the door was opened to limited testimony about the portion of Santana's criminal record of which Moscott had knowledge and that related to his assessment of the danger posed by Santana.[14]

Even if the gun-possession conviction had not been relevant, its admission would not have been sufficiently material to provide a basis for conviction or to remove a reasonable doubt that would have existed without it. See <u>Collins v. Scully</u>, 755 F.2d 16, 18 (2d

---

[14] We note that during this discussion, Santana himself stood up and told the court that he did not mind if his gun conviction was brought up in testimony (Tr. 870-71), but we do not rely on this intervention by the defendant to assess the appropriateness of the trial court's ruling.

Cir. 1985) (finding no materiality when "[t]he properly admitted evidence against [defendant] was very strong" and the improperly admitted evidence "did not directly attribute to [defendant] the commission of the crime charged"). At Santana's trial, the properly admitted testimony of Ms. Roman and her family as well as the many officers involved in the chase and arrest of petitioner overwhelmingly supported Santana's guilt on the charges. Additionally, the gun conviction was not similar to any of the charges against Santana, thus minimizing the likelihood that the jury would infer his guilt on those charges based on the earlier conviction.

In sum, the gun-possession conviction was properly admitted and did not deny Santana a fundamentally fair trial.

<u>CONCLUSION</u>

For the reasons noted, we recommend that the writ be denied and the petition dismissed with prejudice.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries,

with extra copies to be delivered to the chambers of the Honorable
Barbara S. Jones, Room 620, 500 Pearl Street, New York, New York
10007-1312 and to the chambers of the undersigned, Room 1670, 500
Pearl Street, New York, New York 10007-1312. Failure to file timely
objections may constitute a waiver of those objections both in the
District Court and on later appeal to the United States Court of
Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'g denied,
474 U.S. 1111 (1986); Small v. Sec'y of Health and Human Services,
892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ.
P. 72, 6(a), 6(d).


DATED: New York, New York
       July 1, 2009


                              Respectfully submitted,



                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE

67

Copies of the foregoing Report and Recommendation have been
mailed today to:

Mr. Johnny Santana
03-A-1901
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

Alexis Pimentel, Esq.
District Attorney's Office
Bronx County Appeals Bureau -- Habeas Unit
198 East 161st Street
Bronx, New York 10451